## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | |
|---|---|
| MATTHEW WHITFIELD, Derivatively on Behalf of SIX FLAGS ENTERTAINMENT CORPORATION, | ) ) ) |
| | ) Case No.  3:25-cv-2599 |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) **DEMAND FOR JURY TRIAL** |
| SELIM BASSOUL, RICHARD A. ZIMMERMAN, DANIEL J. HANRAHAN, LOUIS CARR, SANDRA COCHRAN, MICHAEL COLGLAZIER, FELIPE DUTRA, STEVEN HOFFMAN, CHIEH HUANG, JENNIFER MASON, ARIK RUCHIM, MARILYN SPIEGEL, and BRIAN WITHEROW, | ) ) ) ) ) ) ) ) ) ) ) |
| Defendants, | ) |
| and | ) ) |
| SIX FLAGS ENTERTAINMENT CORPORATION, | ) ) ) |
| Nominal Defendant. | ) ) |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Matthew Whitfield ("Plaintiff"), by and through his undersigned attorneys, bring this shareholder derivative action on behalf of nominal defendant Six Flags Entertainment Corporation ("Six Flags" or the "Company") against the Company's board of directors (the "Board") and certain of its executive officers seeking to remedy the harm to Six Flags caused by the violations of federal and state law, including breach of fiduciary duties, by the Individual Defendants (as defined below).  Plaintiff alleges the following based upon personal knowledge

as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, review of conference call transcripts, the Company's publicly available documents including United States Securities and Exchange Commission ("SEC") filings, press releases published by and regarding Six Flags, news reports, securities analysts' reports about the Company, filings in the securities class action *City Of Livonia Employees' Retirement System v. Six Flags Entertainment Corporation, et al.,* Case No.: 3:25-cv-02394-JJH (N.D. Ohio) (the "Securities Class Action"), and other publicly available information. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.      This is a shareholder derivative action brought on behalf of Six Flags against the Individual Defendants, certain of the Company's current officers and members of the Board as specified below, for their violations of federal and state law between July 1, 2024 and August 6, 2025 (the "Relevant Period") as set forth below.

2.      The claims arise from the Individual Defendants' violations of law in connection with the July 1, 2024 merger (the "Merger") of legacy Six Flags Entertainment Corporation ("Legacy Six Flags")[1], a Delaware corporation, and Cedar Fair, L.P., a Delaware limited partnership ("Cedar Fair") as well as the materially misleading statements that were made, or caused to be made, by the Individual Defendants following the Merger.

3.      The Merger, which created North America's largest regional amusement park

---

[1]      Legacy Six Flags is distinct from the Company but operated under the same name prior to the Merger. To differentiate, the pre-Merger corporation is referred to herein as "Legacy Six Flags" and the post-Merger corporation is referred to herein as "Six Flags" or the "Company."

operator with approximately 40 amusement parks and water parks, as well several resort properties, was touted as an opportunity to benefit both Legacy Six Flags and Cedar Fair by, *inter alia*, bolstering free cash flow which, in turn, would enable the combined company to increase investments in new rides and attractions, improve food and beverage selection, to grow attendance, increase per capita spending and improve profitability.

4.     In fact, because Legacy Six Flags failed to make adequate capital investments to conduct routine facility maintenance or improve rides and attractions, and made drastic personnel cuts prior to the Merger, the benefits of the combination were unachievable.  Moreover, because of the materially misleading statements concerning the financial condition and operations of Legacy Six Flags made prior to the Merger, shareholders who voted to approve it were unaware that the positive statements about the combined company's future financial prospects, including those in the joint proxy statement issued to solicit votes in favor of the Merger, lacked any reasonable basis in fact.

**Legacy Six Flags**

5.     Prior to the Merger, in February 2021, Defendant Selim Bassoul ("Bassoul"), then a director of Legacy Six Flags, became that company's Non-Executive Chairman and, in November 2021, its Chief Executive Officer ("CEO").  Bassoul was tasked to find and implement reopening and recovery strategies following the massive industry disruptions caused by the COVID-19 pandemic.

6.     Bassoul subsequently implemented a new "premiumization" strategy which he claimed would provide Legacy Six Flags customers with a premium guest experience through park "beautification," upgrading restaurants and restrooms, improving food and beverage offerings, and providing different ticket offerings at a higher price point.  During a February 24, 2022 earnings

call, Bassoul explained that "[t]hrough premiumization, we are focused on guests who are willing to pay more for a premium experience which will lessen the crowding of our parks, reducing pressure on operations and elevating the guest experience." Then-Chief Financial Officer ("CFO") of Legacy Six Flags, Sandeep Reddy, further explained that "[l]ooking ahead, we expect our premiumization strategy to depend less on total attendance and more on total revenue and profit as we focus on more premium guests."

7.      According to Legacy Six Flags, the strategy was successful. During fiscal 2022,[2] Legacy Six Flags reported per capita admissions revenue increased 25% year-over-year, primarily due to higher season pass and single-day tickets prices, as well as decreased promotions.  Legacy Six Flags also had an 18% increase in 2022 per capita in-park revenue, purportedly attributable to "the benefits of our revenue management initiatives and in-park initiatives to improve the guest experience."  Legacy Six Flags' operating expenses also declined 9% during fiscal 2022, purportedly because of "lower labor expenditures at the parks due to a reduction in operating days and more efficient labor scheduling." In its 2022 annual report, Legacy Six Flags represented that the company was "delivering long-term, profitable growth by continuously enhancing the guest experience and by operating efficiently" by "[u]pgrading all aspects of our parks and experiences for our guests and our employees."

8.      Bassoul repeatedly touted the purported success of the premiumization strategy up though the time of the Merger. For example, during a May 12, 2022 earnings call, Bassoul said "everything is going to go up and the value is going to go up. . . .  We're doing the beautification of all our smaller parks.  We're doing all the work we're doing in our water parks across board.

---

[2]      The fiscal year for Legacy Six Flags ends on the Sunday closest to December 31. Legacy Six Flags' 2022 fiscal year ended on January 1, 2023.

We're doing all that restaurant – restroom and restaurant upgrade and food upgrade in all our parks. ***So I think we're going to see people willing to pay more to be in our parks***."[3]

9.      In a November 10, 2022 earnings call, Bassoul reiterated the success of the strategy, stating "we bet that we could upgrade the park experience by investing in our infrastructure and employee friendliness and by lowering attendance to ***create an extraordinary value proposition that will allow us to grow revenue by raising prices in line with value we provide***."

10.      During a May 8, 2023 earnings call, Bassoul made clear that the strategy would continue, stating "[t]oday, we are pushing more events and more interactive family initiatives to getting our guests to spend longer time in our parks and to increase season pass holders visitations per year. ***We have increased the annual CapEx budget for the company to a record number in 2023, 2024 and 2025.  We are investing in our park to become more kids and family friendly.  We are boosting our R&D on technology.  We are increasing our marketing and media spend in 2023 to promote all those initiatives***."

11.      These statements were materially false and misleading, however, because Legacy Six Flags failed to make adequate capital investments for necessary facility maintenance, to make operational improvements or infrastructure repairs, and failed to adequately invest in attraction design or development. In addition,  the reported decrease in labor costs was not "due to a reduction in operating days and more efficient labor scheduling," but rather Legacy Six Flags' drastic personnel cuts that adversely impacted operations and customer satisfaction.

**<u>The Merger</u>**

12.      On November 2, 2023, Legacy Six Flags and Cedar Fair announced an agreement "to combine in a merger of equals," creating the largest amusement park operator in North America

---

[3]      Unless otherwise noted, all emphasis is added.

which would purportedly provide an estimated $200 million in annual cost synergies and generate over $800 million in annual cash flow. During a joint conference call that same day, Bassoul highlighted the significant cash flow generation and cost savings that would purportedly be achieved through the Merger, which he claimed "will allow us to quickly deliver while also deploying capital strategically into our business to enhance performance." Discussing the reasons for the Merger, Bassoul stated:

> Let's talk about why now. Neither one of the companies needed to do the deal we were not coerced to the deal. *I can tell you on Six Flags, we had just almost finished with our transformation*, and you're starting seeing attendance coming up double digit despite weather this summer, how fall sales is basically setting the 2024 very, very well. However, we believe truly that this merger creates a successful amusement park operator in the highly competitive leisure space with an expanded and diversified footprint, a more robust operating model and strong revenue and cash flow generation.
>
> *I tell you, over the past 2 years, we have taken significant steps to transform our operations and create a more agile business while investing in new offerings to delight and excite our guests.* I know that Richard and Brian and their team were earlier than us doing all the what I call elevating the experience. So we're trying to catch up to this combination build on our momentum but making sure that we create a geographic footprint that is expected to mitigate the impact of seasonality and reduced earnings volatility.
>
> Combining our complementary operating capabilities and technology portfolio will help us create a platform for Richard and Brian to improve our park offerings and more efficient system-wide performance. I will tell you what I love about Cedar Fair is they were delivering a more engaging and immersive guest experience than we've ever done. And that's something we need to take to our guests.
> And finally, *I think increasing and bolstering our free cash flow* will increase flexibility to invest in new rides and attraction[s], broader food and beverage selection, additional in-park offering and cross-park initiative. And then *from our side, we are bringing a lot of technologies* that are starting to unveil in this fourth quarter and 2024, specifically to make our guests easier to do business with us, *all of which will be successfully deployed to grow attendance, increase per capita spending and improve profitability.* I will tell you there are a lot of monetizing initiatives that we are both excited about that are coming in, in 2024.

13. On December 22, 2023, CopperSteel HoldCo, Inc. ("CopperSteel"), a Delaware holding company formed to facilitate the Merger and jointly owned by Legacy Six Flags and Cedar

Fair, filed a Form S-4 registration statement in connection with the Merger. The Form S-4, as amended, was declared effective on January 31, 2024.  Also, on January 31, 2024, CopperSteel filed a joint proxy statement (the "Merger Proxy") and prospectus for the Merger on Form 424B3 with the SEC, incorporating and forming part of the registration statement (collectively, the "Registration Statement").

14.     The Registration Statement, including the Merger Proxy used to solicit the votes of the Legacy Six Flag shareholders, however, was materially misleading because it failed to disclose that despite the public statements about the investments purportedly made as part of the premiumization strategy, Legacy Six Flags had grossly underinvested in its parks. Prior to the Merger, Legacy Six Flags failed to do basic park maintenance, to make necessary operational improvements or infrastructure repairs, and failed to adequately invest in attraction design or development. Additionally, to cut costs, Legacy Six Flags drastically reduced its number of employees which, in turn, adversely impacted operations and customer satisfaction. Legacy Six Flags, therefore, required a massive capital infusion to even achieve the results that were claimed to have already been accomplished. Moreover, the anticipated benefits of the Merger, including increases in revenues, earnings, and cash flow that would enable the Company to increase investments in park upgrades were not achievable because of the massive capital expenditures that would be necessary to improve Legacy Six Flags' facilities.

15.     On March 12, 2024, Legacy Six Flags shareholders voted to approve the Merger at a special meeting of shareholders, and the Merger closed on July 1, 2024.[4] Legacy Six Flags and Cedar Fair ultimately merged with, and into, CopperSteel, which became the surviving

---

[4]     Cedar Fair unit holders were to receive a majority equity stake in the combined Company, so no Cedar Fair unit holder vote was required to approve the Merger.

corporation.[5] Following the Merger, CopperSteel changed its name to "Six Flags Entertainment Corporation" and listed its shares on the New York Stock Exchange ("NYSE") under the ticker symbol "FUN." Bassoul became the Executive Chairman of Six Flags, while Cedar Fair's Chief Executive officer ("CEO"), Defendant Richard A. Zimmerman ("Zimmerman"), became CEO of the post-Merger Company.

16.     Following the Merger, Six Flags reported substantial increases in operating costs and expenses and declining profitability, as well as increased capital expenditures in Legacy Six Flags properties.

17.     On August 6, 2025, the full extent of the adverse impact of Legacy Six Flags was disclosed.  In a press release reporting the Company's results for the second quarter, ended June 29, 2025, Six Flags reported quarterly net revenue of just $930 million and adjusted EBITDA of $243 million, far short of consensus estimates of $982 million net revenue and $352 million adjusted EBITDA. In addition, the Company drastically reduced expected 2025 adjusted EBITDA from $910 million to a range of $860 million and disclosed that Six Flags' debt-to-earnings leverage ratio had ballooned to 6.2x, causing the Company to consider the "divestiture of non-core assets" and a 20% reduction of its projected annual capital expenditures to $400 million. The release also disclosed that Six Flags was "reassess[ing]" the long-term guidance the Company had given barely two months prior.

18.     Six Flags claimed the "weather" caused the sharp decline in financial results and the reduction guidance. Analysts, however, attributed the results to significantly rising

---

[5]     All shareholders of Legacy Six Flags and unit holders of Cedar Fair received CopperSteel common stock in connection with the Merger, with the holders of Cedar Fair units owning approximately 51.2% and the holders of Legacy Six Flags common stock owning approximately 48.8% of the outstanding shares immediately after closing. In addition, Legacy Six Flags shareholders collectively received an additional $128 million in the form of a special dividend upon the close of the Merger.

costs attributable, primarily, to Legacy Six Flags.

19. Defendants Bassoul and Zimmerman, the primary architects to the Merger, announced that they would be leaving the Company at the end of 2025.

20. The price of Six Flags' stock dropped from a close of $30.70 per share on August 5, 2025, the day before the release of the Company's second quarter 2025 financial results, to a close of $24.32 per share on August 6, 2025, the day the financial results were disclosed, a drop of $6.38 per share or almost 21%. The price of Six Flags' stock has never recovered and on November 19, 2025, the price of the Company's stock closed at $13.53 per share.

21. On November 5, 2025, the Securities Class Action was filed in this Court, alleging violations of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77o, against the Company, defendants Zimmerman, Bassoul, Gary Mick, Louis Carr, Michelle Frymire, Daniel Hanrahan, Chieh Huang, Jennifer Mason, Enrique Ramirez Mena, D. Scott Olivet, Arik Ruchim, and Marilyn Spiegel. As a result of the foregoing, the Company is not only required to defend itself from liability in the Securities Class Action[6], Six Flags has been exposed to massive class-wide liability.

22. In light of the Individual Defendants' violations of law, including the breach of the fiduciary duties they owe the Company, there is a substantial likelihood of liability in this derivative action and the Securities Class Action for the Individual Defendants who presently serve on the Six Flags Board. Accordingly, those Individual Defendants do not possess the requisite level of disinterestedness and independence to consider a demand to

---

[6] A Form 8-K12B filed with the SEC on July 1, 2024, provides that the Company entered in agreements to indemnify and hold harmless directors and officers of the Company. Therefore, Six Flags must also bear the defense costs of the individual defendants in the Securities Class Action.

commence litigation against themselves and against the other Individual Defendants on behalf of the Company. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. §§ 78n(a)) and Rule 14a-9 (17 C.F.R.§240.14a-9).

24.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

25.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

26.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

27.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because many of the acts and practices complained of herein occurred in substantial part in this District, defendants are found or transact substantial business in this District, Six Flags maintains significant operations in this District, and a substantial part of the events giving rise to the claims occurred in this District, including the preparation and issuance of the Registration Statement which includes the Merger Proxy. Prior to the Merger, Cedar Fair maintained its headquarters in this District.

## PARTIES

### *Plaintiff*

28.     Plaintiff is, and has been at all relevant times, a shareholder of Six Flags, and a shareholder of Legacy Six Flags, whose vote on the Merger was solicited by the Merger Proxy.

### *Nominal Defendant*

29.     Nominal Defendant Six Flags is incorporated under the laws of Delaware with its principal executive offices located at 8701 Red Oak Blvd. #300, Charlotte, North Carolina 28217. Six Flags common stock is traded on the NYSE under the ticker symbol "FUN."

### *Individual Defendants*

#### *Director Defendants*

30.     Defendant Selim Bassoul ("Bassoul") has served as the Executive Chairman of the Board of Six Flags from the close of the Merger on July 1, 2024 and announced he will be leaving the Company at the end of 2025. Bassoul served as President and CEO of Legacy Six Flags and, before that, its Non-Executive Chairman prior to the Merger. According to the Six Flags proxy statement filed with the SEC on Form 14A May 9, 2025 (the "2025 Proxy"), Bassoul's 2024 post-Merger salary was $1,550,000 and his 2025 salary was $1,550,000. Bessoul was paid total compensation of $ 20,358,969 in cash, stock awards, and Non-Equity Incentive Plan Compensation in 2024, and the estimated the total potential cash and equity value of the personal Merger-related payments to Bassoul was approximately $36.5 million according to the Merger Proxy.

31.     Defendant Richard A. Zimmerman ("Zimmerman") has served as the President, CEO, and a director of Six Flags from the close of the Merger on July 1, 2024 and announced he will be leaving the Company at the end of 2025. Prior to becoming the President and CEO

of Six Flags, Zimmerman served as the President and CEO of Cedar Fair. According to the 2025 Proxy, Zimmerman's 2024 post-Merger salary was $1,100,000 and his 2025 salary was $1,100,000. Zimmerman was paid total compensation of $9.113,602 in cash, stock awards, and Non-Equity Incentive Plan Compensation in 2024.

32.     Defendant Daniel Hanrahan ("Hanrahan") has served as the Company's Lead Independent Director of the Company since the close of the Merger on July 1, 2024 and announced he will be leaving the Company at the end of 2025.  According to the 2025 Proxy, Hanrahan was paid total compensation of $284,623 in 2024 in cash and stock awards.

33.     Defendant Louis Carr ("Carr") has served as a director of the Company since the close of the Merger on July 1, 2024, and was a director of Cedar Fair since 2020.  Carr is a member of the Board's People, Culture and Compensation Committee. According to the 2025 Proxy, Carr was paid total compensation of $172,123 in 2024 in cash and stock awards.

34.     Defendant Sandra Cochran ("Cochran") has served as a director of the Company since June 2025 and is a member of the Board's the Nominating and Corporate Governance Committee.

35.     Defendant Michael Colglazier ("Colglazier") has served as a director of the Company since June 2025 and is a member of the Board's People, Culture and Compensation Committee.

36.     Defendant Felipe Dutra ("Dutra") has served a director of the Company since June 2025 and is a member of the Board's People, Culture and Compensation Committee.

37.     Defendant Steven Hoffman ("Hoffman") has served a director of the Company since June 2025 and is a member of the Board's Audit and Finance Committee.

38.     Defendant Chieh Huang ("Huang") has served as a director of the Company from the close of the Merger on July 1, 2024 and is a member of the Board's Audit and Finance Committee and the Nominating and Corporate Governance Committee. According to the 2025 Proxy, Huang was paid total compensation of $299,979 in 2024 in cash and stock awards.

39.     Defendant Jennifer Mason ("Mason") has served as a director of the Company from the close of the Merger on July 1, 2024, and was a director of Cedar Fair since 2020. Mason is the Chair of the Board's Audit and Finance Committee and a member of the Nominating and Corporate Governance Committee. According to the 2025 Proxy, Mason was paid total compensation of $177,123 in 2024 in cash and stock awards.

40.     Defendant Arik Ruchim ("Ruchim") has served as a director of the Company from the close of the Merger on July 1, 2024 as the designee of Legacy Six Flags where he served as a director since January 2020. Ruchim is the Chair of the Board's Nominating and Corporate Governance Committee and a member of the Audit and Finance Committee.

41.     Defendant Marilyn Spiegel ("Spiegel") has served as a director of the Company from the close of the Merger on July 1, 2024 as the designee of Legacy Six Flags where she served as a director since January 2023. Spiegel is a member of the Board's People, Culture and Compensation Committee. On October 10, 2025, Six Flags announced that Spiegel was elected non-executive Chair of the Board effective January 1, 2026.

42.     The Individual Defendants identified in ¶¶ 30-41 above are collectively referred to herein as the "Director Defendants."

**_Officer Defendant_**

43.     Defendant Brian Witherow ("Witherow") has served as the Company's Chief Financial Officer ("CFO") from the close of the Merger on July 1, 2024 and previously served

as the CFO of Cedar Fair since 2012. According to the Company's website, Witherow "served a pivotal role" in the Merger and is "responsible for creating and executing a strategy to drive, account for and assess the effectiveness of the company's entire financial enterprise."

***Relevant Non-Parties***

44.     Jonathan Brudnick ("Brudnick") has served as a director of Six Flags since October 2025, after the August 2025 disclosure of the facts about the Company's financial condition following, and as a result of, the Merger.

45.     Brudnick and the Director Defendants are collectively referred to herein as the "Demand Board."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

46.     By reason of their positions as officers and/or directors of Six Flags, and because of their ability to control the business and corporate affairs of Six Flags, the Individual Defendants owed Six Flags and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Six Flags in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Six Flags and its shareholders so as to benefit all shareholders equally.

47.     Each director and officer of the Company owes to Six Flags and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

48.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Six Flags, were able to and did, directly and/or indirectly,

exercise control over the wrongful acts complained of herein.

49.     To discharge their duties, the officers and directors of Six Flags were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

50.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Six Flags, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

51.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty: to ensure that Six Flags implemented and properly monitored the Company's internal controls over financial reporting; to prevent the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations; and to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the

Company's common stock would be based upon truthful, accurate, and fairly presented information.

52. To discharge their duties, the officers and directors of Six Flags were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Six Flags were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Six Flags' own Code of Business Conduct and Ethics (the "Code of Conduct");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Six Flags conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Six Flags and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain, implement, and monitor an adequate and functioning system of internal legal, financial, and management controls, such that Six Flags'

publicly disclosed financial information would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

53.     Each of the Individual Defendants further owed to Six Flags and the shareholders the duty of loyalty requiring that each favor Six Flags' interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

54.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Six Flags and were at all times acting within the course and scope of such agency.

55.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Six Flags.

## **CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

56.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual

Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

57.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

58.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company, purposefully, recklessly, or negligently, to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

59.     In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Director Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

60.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

61.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Six Flags and at all times acted within the course

and scope of such agency.

## SIX FLAGS'S CODE OF CONDUCT AND ETHICS

62.     Six Flags' Code of Conduct and Ethics ("Code of Conduct") begins with a commitment to "the principle of conducting business in a responsible, honest and ethical manner . . . ."  The Code of Conduct affirms that the Company "make[s] this commitment to our stockholders, guests, neighbors and each other not only out of legal obligation, but because it's the right thing to do. This Code of Conduct and Ethics is intended to act as a shared set of ethical principles to guide our daily business activities and to serve as a foundation for achieving success in the right way."

63.     The Code of Conduct applies to "all officers, directors, and associates of Six Flags . . . ." and violations of the Code of Conduct "may result in corrective action up to and including termination of employment, recovery of damages, and filing of criminal charges."

64.     In a section titled "Applicable Laws," the Code of Conduct states:

It is the Company's policy to observe all laws, rules and regulations applicable to the conduct of its business and you may not engage in illegal activities or permit or encourage others to perform illegal acts on behalf of the Company.

65.     In a section titled "Books and Records," the Code of Conduct states:

The Company's books, records, accounts and financial statements must be maintained in reasonable detail, must appropriately reflect its transactions and must conform both to applicable legal requirements and to the Company's system of internal controls. All business data, records and reports must be prepared truthfully and accurately.

\*      \*      \*

The Company is committed to full, fair, accurate, timely and understandable disclosure in its financial reporting and other public filings and communications. You play a critical role in fulfilling this commitment, especially if you have responsibility for preparing such reports, filings or public communications, (including drafting, reviewing and signing or certifying the information contained therein). You must comply with Company policies, procedures and controls. Accounting and financial

reporting must accurately reflect actual transactions and must follow the Company's accounting and internal control policies as well as all applicable generally accepted accounting principles and laws. You may not engage in fraudulent or misleading financial reporting of the Company's business activities, or divulge non-public or other confidential information pertaining to the Company to unauthorized outsiders.

66.     In a section titled "Legal Compliance," the Code of Conduct states:

You are required to comply with all applicable laws where we do business. Any instance of non-compliance with applicable law(s) may subject the associate to corrective action up to and including termination of employment, recovery of damages, and filing of criminal charges.

### SIX FLAGS'S AUDIT AND FINANCE COMMITTEE CHARTER

67.     Pursuant to Six Flags' Audit and Finance Committee Charter, the purpose of the Audit and Finance Committee (the "Audit Committee") is to:

assist the Board in its oversight of the accounting and financial reporting processes of the Company and the Company's compliance with legal and regulatory requirements. To assist the Board in fulfilling its responsibilities, the Committee shall oversee: (i) audits of the financial statements of the Company; (ii) the integrity of the Company's financial statements; (iii) the Company's processes relating to risk management and the conduct and systems of internal control over financial reporting and disclosure controls and procedures; (iv) the qualifications, engagement, compensation, independence and performance of the Company's independent auditor, and the auditor's conduct of the annual audit of the Company's financial statements and any other services provided to the Company; and (v) the performance of the Company's internal audit function. The Committee will also produce the annual report of the Committee required by the rules of the Securities and Exchange Commission (the "*SEC*").

68.     In a section titled "Financial Statements and Other Financial Disclosures," the Audit Committee Charter states:

**Earnings Releases and Other Financial Information.** The Committee shall discuss with management and the independent auditor and review the Company's earnings releases, including the financial information, use of any "pro forma" or "adjusted" non-GAAP information, and earnings guidance (if any) to be disclosed in such releases. The Committee shall also discuss with management other significant financial information to be provided to analysts or rating agencies.

*       *       *

**Capital and Operating Financial Plans**. The Committee shall review the Company's capital and operating financial plans and make recommendations to the Board. The Committee shall review analysis of the performance of historical capital investments against projections and make recommendations to the Board.

69.     In a section titled "Risk Management, Compliance and Ethics," the Audit Committee Charter states:

> **Risk Management.** The Committee shall review and discuss with management, the head of the internal audit function, as applicable, and the independent auditor any significant risks or exposures and the Company's policies and processes with respect to risk assessment and risk management, and shall assess the steps management has taken to monitor and control such risks, except with respect to those risks for which oversight has been assigned to other Board Committees or retained by the Board. The Committee shall review the Company's annual disclosures concerning the role of the Board in the risk oversight of the Company.
>
> \*     \*     \*
>
> **Legal and Regulatory Compliance**. The Committee shall: (a) review periodically legal and regulatory matters that may have a material impact on the Company's financial statements; (b) monitor compliance of the Company's Code of Conduct and Ethics (the "*Code*"); and (c) review and discuss requests for waivers of the Code involving directors and executive officers and make recommendations to the Board as to whether it should approve any such request.

## BACKGROUND

70.     Legacy Six Flags opened its first park in 1961 in Arlington, Texas. By buying local theme parks across the United States, Legacy Six Flags became one of the largest regional amusement park operators in the world and the largest operator of water parks in North America. In 2009, however, Legacy Six Flags filed for bankruptcy unable to service its debt, reemerged from bankruptcy the following year under bondholder ownership. Legacy Six Flags recovered over time, and its stock price climbed to more than $70 per share in 2018 before the COVID-19 pandemic.

71.     Cedar Fair was founded in the 1870s when Cedar Point park opened in Sandusky,

Ohio. Cedar Fair went public in 1987 and expanded its portfolio by buying various family-owned parks.  All of Cedar Fair parks strive to maintain individual brand identities, cultivating a loyal fan base.

72.     In 2021, following major industry disruptions caused by COVID-19,  Defendant Bassoul took over as Legacy Six Flags' Non-Executive Chairman and then CEO. Under his leadership, in 2022 Legacy Six Flags implemented its "premiumization" strategy by purportedly investing in park upgrades and improvements to drive ticket prices. In 2022, Bassoul said the company wanted to "migrate . . . a little bit from what I call the Kmart, Walmart to maybe the Target customer."  As part of the strategy,  Legacy Six Flags raised the average price of admission to $35.99 from $28.73, leading to the company's admissions revenue per capita increasing 25% year-over-year during its fiscal 2022.

73.     In 2023, Legacy Six Flags represented that it was making numerous investment initiatives to upgrade its parks' physical plants, increasing investments in food and food equipment, and adding new rides to attract higher-tier consumers and increase in-park spending. During Legacy Six Flags' earnings call for the first quarter 2023, Bassoul explained:

> Today, we are pushing more events and more interactive family initiatives to getting our guests to spend longer time in our parks and to increase season pass holders visitations per year.  As the world's largest thrill and regional theme park company, *we are back adding more exciting rides to our theme parks and water parks*.
>
>     *We have increased the annual CapEx budget for the company to a record number in 2023, 2024 and 2025.*  We are investing in our park to become more kids and family friendly.  *We are boosting our R&D on technology.  We are increasing our marketing and media spend in 2023 to promote all those initiatives*.

74.     On November 2, 2023, Legacy Six Flags announced it had entered into a definitive merger agreement to combine with Cedar Fair in a "merger of equals." The Merger was seen as an opportunity to, among other things, benefit from increased scale, and a geographical footprint

that would insulate the companies from seasonal and weather volatility. It was portrayed as a way for Legacy Six Flags to service its high debt while utilizing increased cash flows to invest in capital improvements. The release stated that the Merger was expected to achieve $120 million in cost synergies over two years and $80 million in new revenue synergies within three years, leading to enhanced cash flows and substantial debt reduction. The release further stated that the combined company was expected leverage ratio of 3.7x net debt to adjusted EBITDA, "with a path to reduce the leverage to approximately 3.0x within two years of transaction close."

75.     The release indicated Defendant Zimmerman, Cedar Fair's CEO, would be CEO of the combined company and that Legacy Six Flags' CEO, Bassoul, would be Executive Chairman of the Board. Witherow, CFO of Cedar Fair, would serve as the CFO of the post-Merger Company.

76.     On November 2, 2023, Legacy Six Flags and Cedar Fair hosted a conference call regarding their respective financial results for 3Q23, as well as the Merger. Defendants Zimmerman and Witherow participated for Cedar Fair, and Defendant Bassoul and others participated for Legacy Six Flags. During the call Bassoul stated:

> This starts with our expected annual synergies of $200 million, which we have been – which have been fully divested. We are confident we can achieve these in the next three years and create significant value along the way.
>
> **_In addition, this combination de-risks our businesses in many ways in terms of leverage, weather and the regional mix of our portfolio_**. We will operate an expanded and complementary portfolio of 42 amusement and water parks, 9 resort properties and other entertainment experiences that our guests love. Our expanded footprint will reduce dependency on any one park or any one region, providing us more earnings stability and allowing us to offer more exciting options to guests.
> **_Our free cash flow generation will allow us to quickly delever while also deploying capital strategically into our business to enhance performance_**. Importantly, this merger will also allow us to grow our new company into a global brand with our IP. Our combined season pass and loyalty programs will make this deal even sweeter for our most loyal guests providing enhanced access and additional perks.

77.     Zimmerman also stated that the Merger would "unlock considerable upside opportunity for our shareholders" and that the Company would "utilize enhanced cash flow generation to delever down to our target ratio of 3.0x with additional flexibility to invest in our growth initiatives and drive shareholder returns."

78.     As the call continued, Witherow discussed the "compelling . . . financial benefits" of the Merger for the combined company, stating that the combined company's "diversified footprint will improve performance consistency with a broader scope of locations and offerings to mitigate weather-related and seasonal earnings volatility." Witherow further stated the Company "expect[ed] to have a combined leverage ratio of approximately 3.7x reflecting expected synergies and enhanced cash flow generation. But we have outlined a clear path to reduce that to approximately 3x within the first 2 years." He added: [f]ollowing the close of the transaction, we will prioritize delevering to hit our target leverage ratio and ensure we are maintaining a robust capital structure" as "our first priority."

79.     Defendants Zimmerman was asked to describe "the assets and the CapEx maybe at the Six Flags parks that you'd expect to put in . . . the maintenance that . . . those assets necessarily need?" Zimmerman stated "[t]hese are irreplaceable assets that have incredible value to sustain cash flow – revenue generation, cash flow generation over time." and that there were "always" opportunities to make improvements "on both sides to continue to improve our sites, improve our parks," indicating that there were no undisclosed capital needs at Legacy Six Flags that were any different than those of at Cedar Fair.

80.     While the planned Merger underwent regulatory review, Legacy Six Flags reported its first quarter 2024 results. In an earnings the press release on May 9, 2024, Bassoul was quoted as stating  the 2024 season was "'off to a promising start, with 2024 season pass sales through

April increasing by double-digits compared to last year, pre-booked group sales approaching pre-pandemic levels, and our park beautification and technology initiatives resonating strongly with our guests'" and that Legacy Six Flags would "'launch many thrilling new rides, attractions, and immersive experiences in time for the peak summer season.'" On a related earnings call, Bassoul stated the company was "nearly 3 years into [its] transformation" with results "trending upward" as a result of the company's successful "premiumization" plan.

81.     On March 12, 2024, Legacy Six Flags shareholders voted to approve the Merger at a special meeting of shareholders. Because Cedar Fair unit holders would receive a majority equity stake in the combined company, no vote of Cedar Fair unit holders was required to approve the Merger and no such vote was held.

82.     On June 26, 2024, Cedar Fair and Legacy Six Flags jointly announced that the regulatory conditions for their Merger had been met, "permitting the companies to proceed with the closing" of the Merger. After the Merger, it was ultimately revealed that due to a Department of Justice antitrust review, Cedar Fair was prevented from conducting ordinary due diligence of Legacy Six Flags.  Defendant Witherow later acknowledged during the Company's May 20, 2025 Investor Day: "I keep saying this, until 3 days before the transaction because of the DOJ review process, I couldn't see any of the data."

83.     Pursuant to the Merger, Cedar Fair unit holders received one share of Six Flags common stock for each Cedar Fair unit they owned, while Legacy Six Flags stockholders received 0.58 shares of Six Flags common stock for each Legacy Six Flags share they owned, plus a cash payment via a special dividend that ultimately totaled approximately $128 million.[7] Immediately following the Merger, holders of Cedar Fair units owned 51.2% of the combined Company, while

---

[7]     Cedar Fair unit holders and Legacy Six Flags shareholders also received cash in lieu of any fractional shares of Six Flags common stock.

the holders of Legacy Six Flags common stock owned 48.8%.

84.     The Merger closed on July 1, 2024. On that date, the price of Six Flags stock peaked at over $55 per share.

## SUBSTANTIVE ALLEGATIONS

85.     The Merger Proxy, including the Merger Proxy, contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make adequate disclosures required under the rules and regulations governing the preparation of such documents.

86.     The Merger Proxy stated, "Six Flags and Cedar Fair believe there are significant benefits and synergies that may be realized through leveraging the workforce, scale and guest engagement of Six Flags and Cedar Fair." The Merger Proxy represented that these purported Merger "benefits" included "enabl[ing] cost reductions" and creating a "stronger balance sheet":

> Among other benefits, members of the Six Flags Board noted that the potential transaction would . . . ***enable cost reductions and create a company with a stronger balance sheet.*** Members of Six Flags senior management and the Six Flags Board further ***discussed potential cost and revenue uplift of the potential transaction and the likelihood and timeline for achievement of such synergies***.

87.     The Merger Proxy further stated:

> Members of Six Flags senior management discussed with the Six Flags Board the potential strategic benefits that could result from the potential transaction, including that the potential transaction would create (i) a combined company with expanded and diversified experiences for guests, (ii) ***a stronger balance sheet enabling increased investment and improved guest experiences***, (iii) a larger geographical footprint, which would mitigate weather-related seasonality, ***and (iv) the opportunity to achieve synergies, which Six Flags and Cedar Fair management estimated could reach or exceed $200 million annually by 2027, and the ability of the combined company to achieve such strategic benefits***.

88.     Under the caption "Strategic Considerations and Synergies," the Merger Proxy stated:

- the expectation *that the Mergers will generate total annual synergies of approximately $200 million, including approximately $120 million of administrative and operational cost savings and synergies*, which are expected to be realized within two years following the Closing, and *approximately $80 million in incremental EBITDA from revenue uplift, which is expected to be realized within three years following the Closing*;

- the expectation that the Mergers will result in a combined company with a strong balance sheet, *enabling the combined company to reduce its leverage ratio from approximately 3.7x net debt to CopperSteel Adjusted EBITDA (on a pro forma basis over the last twelve months through the third quarter of 2023, inclusive of synergy realization) to approximately 3.0x net debt to CopperSteel Adjusted EBITDA (inclusive of synergy realization) within two years of the Closing*;

- that *the Mergers will result in a combined company that would have generated $3.4 billion in revenue, $1.2 billion in CopperSteel Adjusted EBITDA and $826 million of free cash flows on a pro forma basis over the last twelve months through the third quarter of 2023 (assuming expected annual synergies of $200 million)* and the belief that the combined company's free cash flows will provide it with flexibility to invest in new rides and attractions, broader food and beverage selections, additional in-park offerings, and cross-park initiatives, such as consumer technology and enhanced guest services, which investments are expected to grow attendance, increase per capita spending and improve profitability while enhancing guests' value and experience across the park portfolio;

- the expectation that *the Mergers will be accretive to adjusted earnings per share for Six Flags Stockholders within twelve months following the Closing*; [and]

- the belief that *the combined company will be able to leverage Cedar Fair's recent park investments experience to accelerate the transformation underway across Six Flags' portfolio*[.]

89.     Legacy Six Flags highlighted the purported investments that the company had made in its park operations leading up to the Merger in the Merger Proxy, stating:

> *We regularly make capital investments for new rides and attractions in*

27

*our parks. In addition, we make capital investments in the food, retail and other in-park areas. We also make enhancements to theming and landscaping of our parks in order to provide a more complete, family-oriented entertainment experience; and invest in our information technology infrastructure to attain operational efficiencies. We regularly perform maintenance capital enhancements*, with most expenditures made during the off-season. Repairs and maintenance costs for recurring and routine maintenance are expensed as incurred and are not included in capital expenditures.

90.     The Merger Proxy similarly stated that Legacy Six Flags was able to cover its existing capital expenditure and other cost needs through existing cash and credit sources, stating:

*Based on historical and anticipated future operating results, we believe cash flow from operations, available cash and amounts available under our Revolving Credit Facility will be adequate to meet our liquidity needs, including any anticipated requirements for working capital, capital expenditures, scheduled debt service and obligations* under arrangements relating to the Partnership Parks.

91.     The statements in ¶¶ 86-90 were materially false and misleading when made because they failed to disclose that Legacy Six Flags had underinvested in its parks and operations, deferring or foregoing basic park maintenance, operational improvements, infrastructure repairs, and ride design and development for several years prior to the Merger; Legacy Six Flags needed to make millions of dollars' worth of undisclosed capital and operational expenditures to maintain or grow Legacy Six Flags' share in the intensely competitive amusement park market; due to the undisclosed capital needs of Legacy Six Flags the revenue, earnings, cash flow, capital and operational investments, cost reductions, balance sheet improvements, and debt reduction plans presented to investors in the Merger Proxy were not reasonably achievable or rooted in facts existing at the time of the Merger; and, as a result, the ostensible rationale for the Merger and its purported benefits lacked any reasonable factual basis.

**Post-Merger Events**

92.     On November 6, 2024, Six Flags issued a press release reporting results for its fiscal

third quarter ended September 29, 2024, the first quarterly results of the Company. The press release stated the Company had $894 million in total operating costs and expenses during the quarter, an increase of $427 million compared to the prior year period primarily due to the addition of Legacy Six Flags properties.

93. During the related 3Q24 earnings call, Defendant Witherow stated the Company expected to "invest between $500 million and $525 million in . . . capital expenditures in both 2025 and 2026," which was "necessary to accelerate the integration process and begin to activate the growth potential of the combined portfolio." Defendant Zimmerman similarly highlighted the need for significant capital expenditures to drive Six Flags' operational and financial results and achieve Merger objectives, stating: "[o]ur ability to successfully grow attendance and improve guest spending levels next year will be driven in large part by our compelling capital program." Zimmerman characterized "strategically investing capital to drive growth, consistent reinvestment in our parks and underlying infrastructure" as "essential for creating long term value."

94. During the question-and-answer portion of the call, an analyst asked about the "[o]bviously" surprising capital needs of Legacy Six Flags that had come to light after the Merger, stating in pertinent part:

> Obviously, if you look at sort of the performance of stock since, since the merger closed, *it seems like there's been somewhat of a shifting narrative and talking to investors, I think that narrative seems to be that you guys were surprised by A, the lack of investments that had been being made at the Six Flags Parks and then B, that the level of investment that would be required to sort of begin that turnaround was much greater than you Six Flags actually anticipated*.

95. On November 14, 2024, Six Flags announced a $1 billion investment plan to "enhance the guest experience." The investments were slated to include new rides, attractions, themed areas, dining upgrades, and technology enhancements across the Company's 42 parks.

96. On February 27, 2025, Six Flags issued a press release reporting results for its fiscal

fourth quarter and year ended December 31, 2024. The press release stated that during the quarter Six Flags' operating costs and expenses totaled $523 million, an increase of $217 million year-over-year, primarily attributable to Legacy Six Flags' operations. The press release also provided Six Flags' 2025 adjusted EBITDA guidance of $1.08 billion to $1.12 billion, exclusive of any portfolio optimization efforts.

97.     During the fourth quarter and full year 2024 earnings call, Defendant Witherow disclosed that the Company was lowering its planned 2025 capital expenditures to a range of $475 million to $500 million, which he acknowledged included "some level of investment on deferred items at the legacy Six Flags parks."

98.     On May 1, 2025, Six Flags issued a press release announcing plans to close Six Flags America and its companion water park, Hurricane Harbor, in Bowie, Maryland after the 2025 season.

99.     On May 8, 2025, Six Flags issued a press release reporting results for its fiscal first quarter ended March 30, 2025. The press release reported that during the quarter operating costs and expenses totaled $412 million, an increase of $197 million compared to 1Q24, which were primarily the result of Legacy Six Flags' operations during the period. The press release stated net loss attributable to the combined Company totaled $220 million, which included $134 million of net loss from Legacy Six Flags' operations.

100.    On an earnings call, an analyst asked management to explain why the "rate of EBITDA decline was up . . . nearly triple what it was last year" for Legacy Six Flags' operations. In response, Defendant Witherow conceded that the sudden erosion in earnings was directly attributable to the investment needs of Legacy Six Flags parks, stating in pertinent part:

> Yeah, Mike, so I think if you look at, the two sides of the portfolio, we certainly with the six side of our portfolio, the Six Flags parks, more of those

30

opening up earlier, we invested and it's a big chunk of the timing difference I mentioned on the cost side. I'd say more of it is happening from the cost side as we brought forward a lot of off-season. Whether you want to call it maintenance or pre-opening costs, we brought a lot of those from a timing perspective earlier in the year here in 2025, and so ***that's a bigger part of the equation on our Six Flags side of the portfolio***.

101.   An analyst asked about "the maintenance stuff you're working on at Six Flags with respect to, lighting and, the little things . . . [t]hat had kind of gone undone over the years" and whether these costs had been factored into the Company's infrastructure improvement plans. Defendant Zimmerman admitted that "the list is always long" for needed improvements at the parks.

102.   On May 20, 2025, Six Flags held an Investor Day during which the Company discussed its long-term operational and financial targets and corporate initiatives. Zimmerman began the call by admitting that the Company's "leverage is higher than certainly I would like" but stated that Six Flags planned to "generate free cash flow that we can reinvest in the business but also pay down debt that will let us reduce our leverage to below 4 times by the end of 2026." During his prepared remarks, Witherow stated that to grow attendance and achieve cash flow generation, Six Flags intended to reinvest in the business 12% to 13% of its net revenue – far higher than the high single-digit historical reinvestment rate of Legacy Six Flags.

103.   During the question-and-answer portion of the call, Russell, Six Flags' Director of Investor Relations, observed that "the legacy Six Flags portfolio is kind of the focus" for the Company's planned capital expenditure increases. Dieckmann, Six Flags' Chief Strategy Officer, confirmed: "Yes, [Legacy Six Flags parks are] going to get a significant share of it . . . ." Russell followed by noting that Legacy Six Flags' historical capital expenditure rate "was more like 9 to 10[%]" of net revenues and asked whether there is a "point where the Six Flags attractions catch up to the Cedar Fair, why couldn't we get back to something like 9% to 10% of revenues?" He

31

continued by asking whether this increase reflected a "structural change" in the business. Zimmerman responded that the planned increase in expenditures simply reflected what "we need to do [for] . . . infrastructure" and "according to what we can drive in terms of the attendance."

104.     On May 23, 2025, Six Flags announced it was firing all 27 park presidents, and that the roles would not be filled because the Company was moving to a "regional operating structure" to centralize certain functions and responsibilities at the corporate level.  The leadership layoffs were part of a 10% staff reduction in full-time employees across the Company.

105.     On August 6, 2025, Six Flags issued a press release reporting results for its fiscal second quarter ended June 29, 2025.  During the quarter, Six Flags achieved quarterly net revenue of just $930 million and adjusted EBITDA of $243 million, far below consensus estimates of $982 million net revenue and $352 million adjusted EBITDA. The press release reported that expected 2025 adjusted EBITDA in a range of $860 million to $910 million, a $215 million reduction. The press release further revealed that the Company's debt-to-earnings leverage ratio had grown to 6.2x, causing Six Flags to consider the "divestiture of non-core assets" and to reduction of its projected annual capital expenditures to $400 million, a 20% cut.  The release also stated that Six Flags was "reassess[ing]" the long-term guidance the Company had given barely two months earlier.

106.     Six Flags attempted to blame the "weather" for the results and guidance reductions, during the second quarter earnings call, several analysts found that explanation unconvincing.  For example, Stifel, Nicolaus & Company analyst Steven Wieczynski ("Wieczynski") began the question-and-answer portion of the call in pertinent part:

> I guess to start, ***I'm kind of confused in terms of your macro pressure comments***. When you refer to macro pressures, are you referring to weather?
> Or are you indicating that you've seen a material change in customer spending patterns because of macro fears which aren't weather-related. ***I just can't figure out what you guys are referring to, whether headwinds make***

*sense to us*.

107.    When Defendants Zimmerman and Witherow attempted to explain the Company's position, Wieczynski pushed back, stating it was "confus[ing]" for ephemeral weather conditions to have such a drastic impact to the Company's long-term guidance, stating in pertinent part:

> But *wondering why that would have such a material impact on these goals that were kind of put in place for three years out*?
>
> And maybe saying that a little bit differently. *I would have thought your '28 targets would have embedded some pretty significant unperfect weather macro headwinds*, something along those lines that would still kind of allow you to get close to that $1.5 billion target. So I'm not sure if maybe you guys are kind of walking that target back now given the change with Richard and the new CEO coming, *I guess I'm just a little bit confused there*.

108.    Later in the call, an analyst focused on the surprise jump in expenses in the quarter, which the Company had noted included a $25 million "pull forward," stating that "when I sort of back out the $25 million of cost that you've laid out, it seems like a lot of growth in terms of operating expenses."

109.    Mizuho Securities analyst Ben Chaiken ("Chaiken") followed up on this line of inquiry, pressing the Company to explain the unexpected first half cost increases and failure to lower projected costs for the remainder of the year despite the purported weather-related park closures, stating:

> Maybe just a clarification on – maybe just a clarification on costs. *I don't totally f[ollow] the variables*. So I guess your guide prior to this quarter was for cash cost to be down [3%], it's kind of like what we were talking about on 1Q, but then attendance was materially lower with incremental part closures.
>
> I think you kind of suggested the prepared remarks somewhere around 30 incremental park closure days year over year. *So why is minus 3% still the right answer? Shouldn't that be an opportunity for cost to be much lower*?
>
>            *     *     *
>
> I guess *I'm just trying to figure out if the parks were not even open. Like*

33

*what's the offset if there's – again, these are round numbers, but 30 incremental part closure days, where is – can you help us with the offset of what are the costs went up maybe that are keeping you at that minus 3%*?

110.    During the call, Jefferies analyst David Katz again focused on Six Flags' costs and capital needs, asking whether it was "fair that we should think about much of what's occurred within the [Legacy Six Flags] parks more so than the Cedar Fair legacy park, the implication that those have maybe turned out to be a bit of a different animal than what was expected."

111.    Goldman Sachs analyst Lizzie Dove followed up on these remarks by tying the lack of pre-Merger investment in Legacy Six Flags parks to the sudden erosion in profitability, stating in pertinent part:

> And then just to kind of follow up on David's question a little bit on the legacy Six parks. *The tenant decline was somewhat similar at legacy Six than legacy Cedar, but the EBITDA result or the pressure was a lot worse at legacy Six. I think the margins are about 16%. And so I'm curious just like how you think about like reinvestment needs in those parks. And how kind of quickly those kind of initiatives can kind of come through over the next few years*?

112.    Management's responses failed to stop investor questions or assuage their concerns about the state of the Legacy Six Flags assets and the implications for the Company's business and prospects. In an analyst note issued on August 6, 2025, Chaiken stated Six Flags' attempts to blame weather for the disappointing results "doesn't make any sense" He stated the "largest concern/criticism over the years" revolved "around expenses" and, in particular, the Company's "ability to move/operate dynamically, particularly around costs." Chaiken observed that the cost concern was "on full display today" with the revelation of significant cost pull forwards into the quarter and failure to decrease planned expenses despite more park closure dates. In a separate analyst note issued that same day, Chaiken called the Legacy Six Flags' results "baffling," noting Legacy Six Flags' revenue fell 11% and its adjusted EBITDA collapsed over 55% during the quarter.

113.    An August 6, 2025 analyst report by Barclays similarly concluded that the unexpected increase in costs during the quarter "proves that the 2Q weakness was more than just weather."  The report noted that Six Flags' 2Q25 results lapped its 2Q24 results, which had also suffered from "extreme weather and hurricane impacts," casting further doubt on the Company's proffered explanation.  The report concluded that Six Flags' "credibility is low."

114.    On August 14, 2025, credit-rating company S&P Global Ratings downgraded Six Flags to a BB- rating, saying its debt levels were too high relative to earnings and that the recent attendance issues were expected to delay de-leveraging efforts.

115.    Numerous media outlets reported on the surprising demise of Six Flags following the Merger. For example, an August 31, 2025 article on Cleveland.com entitled "What's next for Six Flags? Cedar Point parent faces park sell-off, possible bankruptcy" cited several analysts and market observers who opined that Six Flags would need to engage in substantial asset sales to improve its financial condition. Dennis Speigel, an industry consultant, stated: "'If I were running the company, there are 10 to 12 parks I would keep, pay off debt and start over . . . I wouldn't be surprised if you see the company on the precipice of bankruptcy to get that debt off the books.'" He added: "'I think their due diligence on this merger was just too fast. They overpromised and underdelivered.'" Analyst Hardiman was quoted in the article as noting: "'It's about the biggest miss I've ever seen in the theme park industry versus expectations.'" He also reportedly shared his "belie[f] that perhaps Cedar Fair executives underestimated how deeply troubled the legacy Six Flags parks are."

116.    Following Six Flags' disastrous financial and operational, it was announced that Defendants Bassoul and Zimmerman would resign at the end of the year.

117.    The price of Six Flags' stock dropped from a close of $30.70 per share on

August 5, 2025, the day before the release of the Company's second quarter 2025 financial results, to a close of $24.32 per share on August 6, 2025, the day the financial results were disclosed, a drop of $6.38 per share or almost 21%. The price of Six Flags' stock has never recovered and on November 19, 2025, the price of the Company's stock closed at $13.53 per share.

### DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

118.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the violations of law and breach of fiduciary duties by the Individual Defendants.

119.    Six Flags is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

120.    Plaintiff is a current shareholder of Six Flags, a shareholder of Legacy Six Flags, and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

121.    A pre-suit demand on the Board of Six Flags is futile and, therefore, excused. At the time this action was commenced, the thirteen-member Board was comprised of Defendants Bassoul, Zimmerman, Hanrahan, Carr, Cochran, Colglazier, Dutra, Hoffman, Huang, Mason, Ruchim, and Spiegel, along with non-party director Brudnick. Accordingly, Plaintiff is required to show that six of the directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, at least twelve of the Board's current members are incapable of making an

independent and disinterested decision to institute and vigorously prosecute this action, because they face a substantial likelihood of liability. Therefore, demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

122. The Director Defendants either knew or should have known of the false and misleading statements in the Merger Proxy used to solicit Legacy Six Flags' shareholders to vote in favor of the Merger and/or, following the Merger, failed to disclose the truth regarding massive capital expenditure necessary to remediate Legacy Six Flags' years-long underinvestment in its parks and infrastructure.

123. Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's shareholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

124. Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the Company's non-compliance with applicable law and regulations, such as Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(b)(2)(ii), which required that the Registration Statement, including the Merger Proxy, "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

125. According to the 2025 Proxy, neither Defendant Bassoul nor Zimmerman is independent. Moreover, Defendant Bassoul issued materially false and misleading statements concerning the purported success of Legacy Six Flags' premiumization strategy and he is therefore incapable of considering a demand. Likewise, Defendant Zimmerman made materially misleading statements about the financial benefits of the Merger when, as admitted

by Defendant Witherow, the Department of Justice's antitrust review prevented review of Legacy Six Flag's data until 3 days before the Merger.

126. In addition, Defendants Bassoul, Zimmerman, Carr, Hanrahan, Huang, Mason, Ruchim, and Spiegel. are not disinterested because they are named as defendants in the Securities Class Action and face significant personal liability based on substantially the same wrongdoing as alleged herein, specifically issuing and/or authorizing the issuance of materially false and misleading statements in connection with the Merger.

127. Defendants Hoffman, Huang, Mason, and Ruchim currently serve as members of the Company's Audit Committee (the "Audit Defendants") and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, risk management, disclosure controls and procedures, capital and operating financial plans, and legal and regulatory compliance. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and the failure to disclose material information concerning the negative impact of the Merger due to Legacy Six Flags. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

128. The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Directors to also adhere to the Company's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in issuing and/or causing the

issuance of materially false and misleading statements in the Merger Proxy and/or concealed the true facts about Legacy Six Flags' adverse impact on the Company's operations and financial condition after the Merger closed. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties and, therefore, demand upon them is futile.

129.    All of the Director Defendants derive substantial revenue from the Company, control the Company, and are indebted to each other. These conflicts of interest have precluded the Board's current members from calling into question the Director Defendants' misconduct. Importantly, none of the Board's current members have taken no remedial action to redress the conduct alleged herein.

130.    The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the Board face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

131.    The acts complained of herein constitute violations of the federal securities law and state law, including the breach of fiduciary duties owed by Six Flags' Director Defendants, and these acts are incapable of ratification.

132.    The Individual Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and

officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Six Flags. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Individual Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain officers of Six Flags, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit because that would expose them to the loss of insurance coverage and personal liability for the wrongdoing alleged herein. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

133.    If there is no directors' and officers' liability insurance, then the directors will not cause Six Flags to sue the Defendants named herein, since, if they did, they would face large uninsured individual liabilities.[8] Accordingly, demand is futile in that event as well.

134.    Thus, for all of the reasons set forth above, at least twelve of Six Flags' current directors are unable to consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## COUNT I

**Against Defendants Bassoul, Zimmerman, Hanrahan, Carr,
Huang, Mason, Ruchim, and Spiegel for Violations of § 14(a)
of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 (17 C.F.R.§240.14a-9)**

135.    Plaintiff incorporates by reference and realleges each and every allegation set

---

[8]    Corporate directors and officers who acted in bad faith may not be indemnified by the Company under 8 *Del. C.* § 145(a).

forth above, as though fully set out herein.

136.    Defendants Bassoul, Zimmerman, Hanrahan, Carr, Huang, Mason, Ruchim, and Spiegel violated § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

137.    Defendants Bassoul, Zimmerman, Hanrahan, Carr, Huang, Mason, Ruchim, and Spiegel, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the Merger Proxy.  As alleged above, the Merger Proxy included materially false and misleading statements concerning Legacy Six Flags and the purported financial benefits of the Merger to solicit votes in favor of the Merger from Legacy Six Flags shareholders.

138.    The statements in the Merger Proxy emphasizing the beneficial financial impact of the Merger were materially false and misleading because the Merger Proxy failed to disclose that Legacy Six Flags had materially underinvested in its parks and operations, and failed to adequately perform basic park maintenance or make operational improvements, infrastructure repairs, or ride design and development for several years prior to the Merger; Legacy Six Flags needed to make millions of dollars in undisclosed capital and operational expenditures to maintain or grow Legacy Six Flags' share in the intensely  competitive amusement park market; due to the undisclosed capital needs of Legacy Six Flags, the revenue, earnings, cash flow, capital and operational investments, cost reductions, balance sheet improvements, and debt reduction plans presented to investors in the Merger Proxy were not reasonably achievable or based in facts existing at the time of the Merger; and, as a result,  the ostensible rationale for the Merger and its purported benefits lacked any reasonable factual basis.

139.    The  materially  false  and  misleading  statements  in  the  Merger  Proxy

misleadingly induced shareholders to vote in favor of the Merger.

## COUNT II

### Against the Individual Defendants
### For Breach of Fiduciary Duty

140.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully out forth herein.

141.    The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

142.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

143.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by making and/or causing others to make materially false and misleading statements about the benefits of the Merger and/or failing to disclose the truth regarding adverse impact of Legacy Six Flags on the Company's financial condition and operations.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

144.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages, including costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

145.    In addition, as a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage to its corporate image and goodwill.

## COUNT III

### Against the Individual Defendants for Aiding and
### Abetting Breach of Fiduciary Duty

146.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully out forth herein.

147.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breach of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

148.    Plaintiff, on behalf of Six Flags, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants
### For Unjust Enrichment

149.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully out herein.

150.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Six Flags.

151.    The Individual Defendants either benefitted financially from the improper

conduct, or received bonuses, stock options, or similar compensation from Six Flags that were tied to the closing of the Merger or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

152.     Plaintiff, as a shareholder and a representative of Six Flags, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

153.     Plaintiff, on behalf of Six Flags, has no adequate remedy at law.

## COUNT VI

### Against the Individual Defendants
### For Abuse of Control

154.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set out herein.

155.     The Individual Defendants misconduct alleged herein constituted an abuse of their control over the Company, for which they are legally liable.

156.     As a direct and proximate cause of the Individual Defendants' abuse of control, the Company has sustained substantial damages.

157.     Plaintiff, on behalf of the Company, has no adequate remedy at law.

## COUNT VII

### Against the Individual Defendants
### For Waste of Corporate Assets

158.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set out herein.

159.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue.  It resulted in continuous, connected, and ongoing harm to the Company.

160.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and collecting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Class Action.

161.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

162.    Plaintiff, on behalf Six Flags, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.    Awarding punitive damages;

D.    Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

E.      Implementing appropriate governance reforms and procedures by the Company to ensure that the wrongdoing alleged above are not repeated;

F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: November 26, 2025

/s/ John C. Camillus
John C. Camillus, Trial Attorney (007435)
**LAW OFFICES OF JOHN C. CAMILLUS, LLC**
P.O. Box 141410
Columbus, OH 43214
Telephone: (614) 992-1000
Facsimile: (614) 559-6731
Email:  jcamillus@camilluslaw.com

**RIGRODSKY LAW, P.A.**
Seth D. Rigrodsky
Timothy J. MacFall
825 East Gate Boulevard,
Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
Email: sdr@rl-legal.com
Email: tjm@rl-legal.com

*Attorneys for Plaintiff*